

**EOD**

06/17/2008

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **ECCO DRILLING CO., LTD.** | § | Case No. 07-60987 |
| | § | |
| | § | |
| Debtor | § | Chapter 11 |

**MEMORANDUM OF DECISION**

This matter is before the Court upon the Motion to Determine Characterization of

Leases filed by Ecco Drilling Company, Ltd., the debtor in the above-referenced chapter

11 bankruptcy case.  Ecco seeks a determination that its agreements executed in 2006

with Bernard National Loan Investors, Ltd. are not finance leases as they purport to be,

but are rather disguised secured transactions.  Upon conclusion of the evidentiary hearing

conducted on this matter, the Court took the matter under advisement.  This memorandum

of decision disposes of all issues pending before the Court.[1]

**Factual and Procedural Background**

In 2006, Ecco Drilling Co., Ltd. sought financing with which to expand its

business of conducting oil and gas drilling operations.  After several unsuccessful

attempts to gain conventional financing for the acquisition of additional drilling rigs,

Ecco signed an agreement purporting to be a finance lease on April 26, 2006 with Brin

---

[1]  This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §1334(b) and 28
U.S.C. §157(a).  The Court has the authority to enter a final order in this contested matter since it
constitutes a core proceeding as contemplated by 28 U.S.C. §157(b)(2)(A) and (O).

Investment Corporation, acting through its principal, Joe Gasparini (the "April Lease"), whereby Brin would provide funding for the completion of two partially-completed drilling rigs, known as the Brewster and the U36, and funds for acquiring three new rigs referenced as the F&H rigs. The document was denominated as a "Master Lease Agreement" under which components for individual units were to be acquired at periodic intervals and each would be listed on a separate lease schedule, which stood as a separate agreement and which would supersede the master document in the event of any conflict of terms.[2]

Unknown at the time to the principals of Ecco, Brin was actually incapable of funding any of the amounts contemplated by the agreement. In fact, Brin was not a financing entity at all. It was instead an entity with a joint venture relationship with an $8 billion hedge fund known as D.B. Zwirn Special Opportunities Fund, L.P. (hereinafter "Zwirn") to whom Gasparini forwarded potential investment opportunities. After this particular Gasparini pitch,[3] Zwirn funded the original $25.2 million which eventually was forwarded to vendors as progress payments as components were acquired and equipment was delivered. Brin assigned its interest in the April Lease to Zwirn as of May 1, 2006.[4]

However, cost overruns began to plague the completion of the rigs contemplated

---

[2] Ecco Ex. 9, ¶1.1.

[3] Ecco Ex. 19.

[4] Ecco Ex. 22.

by the April Lease, and Ecco was struggling to maintain financial viability while desperately seeking the additional sums needed to complete the partially-constructed rigs. It made at least one payment to Brin during the initial six-month period under the April Lease but, unfortunately, no payments were forwarded to Zwirn as the true holder of the contractual rights.  While maintaining the secrecy of his company's assignment of the April Lease to Zwirn and though it again apparently had no capital with which to fund such a commitment, Brin agreed to advance additional sums to Ecco for the completion of the unfinished rigs and for new acquisitions.  Ecco thereafter proceeded with plans to acquire more rigs and/or rig components, as well as associated trucks and drill pipe.

Meanwhile, Zwirn began to be concerned about whether it was receiving accurate information from Gasparini and the financial viability of the Ecco deal in general.   Two rigs were completed in the summer of 2006, but several more were in various stages of completion.  Upset that the initial funding had been scattered among various projects instead of focused upon a few, thereby delaying the installation date of the rigs under the lease, Zwirn demurred from any commitment for the additional funding that Brin had promised to Ecco for completion of the various projects.[5]

Because of the delay in getting the rigs on line and its growing skepticism about the quality of information it was receiving through Gasparini, Zwirn subsequently revealed itself to Ecco as the true party in interest under the April Lease and began to

---

[5] Ecco Ex.13.

-3-

threaten the exercise of its foreclosure rights against Ecco property due to nonpayment in the fall of 2006.  Now recognizing that the promise of obtaining the needed funds from Brin was illusory, Ecco then engaged in a series of tense discussions with Zwirn about additional financing in an effort to salvage the rig procurement program.  Those talks resulted in the advancement of an additional $17.3 million by Zwirn, raising the total to approximately $42.3 million, and the tendering of additional consideration from Ecco in the form of warrants and a revised residual purchase option.  The agreement of the parties was memorialized in two documents executed in November 2006 listing Zwirn's subsidiary,  Bernard National Loan Investors, Ltd., as lessor,[6] and Ecco as lessee.

The "Amended and Restated Master Lease Agreement" superseded the April agreement and its stated purpose was "to assure that their form and substance fully reflects their intent and to address certain matters which arose subsequent to the April 06 Master Lease."[7]  The agreement was structured as a master document with one attached and superseding schedule which incorporated the schedules from the April 2006 document.  The equipment was identified as the "personal property of Lessor."[8]  Each schedule specified a four-year initial term and then provided for a month-to-month

---

[6]  Though Bernard is ostensibly listed as the lessor in the documents, it was merely the vehicle through which Zwirn participated in the transaction with Ecco.  All relevant decisions were made by Zwirn and, with exception of references to actual lease provisions, it will be identified as the purported lessor throughout this memorandum for ease of reference.

[7]  Ecco Ex. 8, 7th recital.  Brin and/or Gasparini were hereby eliminated from the transaction.

[8]  *Id*. at ¶ 1.2.

continuance of the terms until Ecco gave 120 days' written notice of any intent to terminate.[9]  Each schedule was to constitute a net lease[10] wherein Ecco was solely responsible for the payment of taxes,[11] insurance,[12] delivery charges,[13] and other ongoing responsibilities, and the risk of loss rested solely upon Ecco.[14]  Because Ecco had dealt with a third-party supplier, Bernard disclaimed the issuance of any warranty regarding the equipment to be procured.[15]  The document states an intention that "each such Schedule shall qualify as and be a 'finance lease' under UCC 2A."[16]  Bernard was given the right to accelerate all payments due "for the full term of any and all Schedules" in the event of Ecco's default.[17]  Bernard was granted a first lien on all of Ecco's assets and Ecco's principals were required to execute guaranty agreements to secure Ecco's performance under the agreement.[18]  Of greatest significance was that the attached schedule provided Ecco, with certain stipulations, an option "to purchase all of the Equipment leased

---

[9]  *Id*. at ¶ 2.1.

[10]  *Id*. at ¶ 3.

[11]  *Id*. at ¶ 6.2.

[12]  *Id*. at ¶ 12.

[13]  *Id*. at ¶ 8.2.

[14]  *Id*. at ¶ 11.1.

[15]  *Id*. at ¶ 5.

[16]  *Id*. at ¶ 5.2.

[17]  *Id*. at ¶ 10(b).

[18]  *Id*. at ¶ 20.1.

hereunder . . .  on an "AS IS WHERE IS" basis for an amount equal to 15% of the greater

of (i) the value of such Equipment . . . or (ii) 60 % of the going concern value of Lessee

determined by a third party appraiser."[19]

For the new rigs to be financed, the parties also executed a document entitled the

"Master Lease Agreement."[20]  This agreement was also structured as a master document

and it was virtually identical to the Restated Agreement but contained a schedule of new

projects.[21]  The document again claimed to be a finance lease.[22]  The purchase option was

again established as 15% of the greater of the value of the equipment, but in this

document the alternative was 40% (not 60%) of the going concern value of Ecco as

determined by a third party appraiser.[23]

Collectively under the agreements, Ecco was obligated to tender to Zwirn forty-

eight (48) monthly payments of $1,167,617.51[24], for a total of $56,045,640.48 –

---

[19]  *Id*. at ¶ F of the executed schedule attached thereto.

[20]  Ecco Ex. 7.

[21]  It is undisputed that sections 1 through 33 of the two November leases are identical and they contain identical Exhibits A through J.  The only differences in the Leases are with respect to the first seven paragraphs of the "Amended and Restated Master Lease Agreement," the Schedules, which set the "monthly rent" under each Lease and the Purchase Option under each Lease, and the Annexes, which list the equipment acquired under each Lease and the purchase orders relating to each vendor.

[22]  *Id*. at ¶ 5.2.

[23]  *Id*. at ¶ F of the executed schedule attached thereto.  Thus, combined with the option price formula contained in the Restated Lease, Ecco's purchase option was 15% of the fair market value of the equipment or 100% of Ecco's going concern value.

[24]  A monthly payment of $699,758.53 was required under Schedule No. 1 to the Amended and Restated Master Lease (Ex. B-7), and a monthly payment of $467,858.98 was required under the

constituting an approximate 14% return component added to the $42.3 million advanced

by Zwirn.  However, other than the initial payment in November 2006, Ecco made no

payments on the leases to Zwirn.  Under the threat of foreclosure by Zwirn, Ecco

voluntarily filed for bankruptcy relief under chapter 11 of the Bankruptcy Code on

November 23, 2007.

## Discussion

Once again this Court is called upon to interpret whether a document which

purports to be a lease actually constitutes a true lease[25] or whether it is instead a disguised

security agreement which creates a security interest under §1-201(37) of the Uniform

Commercial Code.[26]  In *In re Triplex Marine Maint., Inc.*, 258 B.R. 659 (Bankr. E.D.

Tex. 2000), this Court engaged in a rather extensive discussion of the methodologies

which have been employed to distinguish true leases from disguised security interests and

the efforts to bring some degree of clarity to this troublesome area.  Differentiating

between the two has become increasingly  problematic in recent years by the advent of the

financing lease, now recognized under Article 2A of the U.C.C., which shares many

---

Equipment Lease Schedule 1 to the Master Lease (Ex. B-9).

[25] Generally, in a lease, the lessor relinquishes its right to possession and use of goods for a specified term while retaining title and the right to any residual value that remains in the goods after the lease terminates.  In a secured financing transaction, a seller relinquishes not only right to possession and the use of goods, but also transfers title and any residual value which might exist in the goods at the conclusion of the financing term.

[26] A security interest is "an interest in personal property or fixtures which secures payment or performance of an obligation." N.Y. U.C.C. §1-201(37) (McKinney 2001).

characteristics with a secured transaction and has generally rendered obsolete any methodology formerly used by courts based upon identifying attributes of ownership.[27] Thus, changing business practices have led to changes in the statutory guidance provided to courts charged with detecting secured transactions disguised as leases.

As an initial matter, "[w]hether a consignment or a lease constitutes a security interest under the Bankruptcy Code will depend upon whether it constitutes a security interest under applicable State or local law." *In re Lamar*, 249 B.R. 822, 825 (Bankr. S.D. Ga. 2000). Pursuant to the agreement of the parties as expressed in a choice of law provision contained in the leases,[28] and as confirmed by the parties in open court, New York law governs the construction of the leases. The Court will therefore apply New York law to determine the true nature of the agreement.[29]   The burden of proof is upon

---

[27] This is true because leases now constitute a legitimate form of financing the acquisition of needed assets. As one commentator has observed:

> Leases are a form of financing . . . because they provide somebody with control and beneficial use of goods without having paid the full purchase price. They achieve that "financing" not by extending credit. . . . But leases achieve financing by dealing with rights of possession. So the key here is that when we are talking about lease transactions that go into Article 2A, we are talking about transactions in which, at least nominally, the purpose of the deal is to put somebody, that is, the lessee, in physical possession of the goods with the right to use them.

Raymond T. Nimmer, *U.C.C. Article 2A: The New Face of Leasing*, 3 DePaul Bus. & Comm. L.J. 559, 562-63 (2005).

[28] See ¶ 30 of Ecco Ex. 7 & 8.

[29] Though there is no significant difference in the statutory approaches to this problem adopted in New York and Texas, the provisions of §1-201(37) have now been re-codified in the most recent amendment to the Uniform Commercial Code and Texas has incorporated those changes. The definition of "security interest" is now provided in §1-201(35) and the guidelines for distinguishing a lease from a security interest have been moved to §1-203. However, New York has yet to adopt these recent stylistic revisions.

Ecco to demonstrate by a preponderance of the evidence that Zwirn's interests arising from the referenced leases should be recharacterized as a disguised security interest. *Worldcom, Inc. v. Gen. Elec. Global Asset Mgmt. Serv. (In re Worldcom, Inc.),* 339 B.R. 56, 62 (Bankr. S.D.N.Y. 2006); *Triplex Marine*, 258 B.R. at 664.

Zwirn contends that the difficulty in distinguishing true leases from disguised security interests should be properly resolved by giving credence to the parties' freedom to contract, their expressed intentions, and the resulting self-characterization of these documents as financing leases.  However, under revised §1-201(37) applicable to this dispute, the intention of the parties has been abandoned as a proper tool by which to distinguish a true lease from a disguised security interest and replaced by an evaluation of the economic structure of the particular transaction.[30]  As recognized in *Duke Energy Royal, L.L.C. v. Pillowtex Corp. (In re Pillowtex Corp.)*, 349 F.3d 711 (3d Cir. 2003):

> . . . the New York U.C.C. no longer looks to the intent of the drafting parties to determine whether a transfer is a lease or a security agreement. Specifically, the 1992 version of §1-201(37) directed courts to determine "[w]hether a lease is *intended* as security"; this language was amended in 1995 to read "whether a transaction *creates* a lease or security interest."  In this way, the reference to the parties' intent was explicitly omitted.

---

[30]  Zwirn's reliance upon *In re Edison Bros. Stores, Inc.*, 207 B.R. 801, 809 (Bankr. D. Del. 1997) as authority for its position is misplaced in that *Edison Bros*. was decided under the prior version of §1-201(37), which attempted to decipher the intent of the parties rather than the economic structure of the transaction.  Under the current regimen, even Article 2A governing finance leases defers to the analysis outlined in §1-201(37).  If the transaction meets the definition of security interest under §1-201(37), then it does not qualify as a lease under §2A-103(1)(j).

*Id*. at 721 (emphasis in original).[31]

In examining the economic structure of a purported leasing transaction, particularly with the growing use of financing leases, we are essentially searching for economic realities.  In theory, those realities would seem easy to identify:

> In a true lease, the economics are that the lessor has a realistic expectation of having the goods returned to it and having a residual value that it can then realize in those goods.  So the key is whether or not the transaction in and of itself contemplates almost inevitably giving ultimate control and ownership for the life of the product to the lessee or giving an economically viable product back to the lessor at the end of the lease.

Raymond T. Nimmer, *U.C.C. Article 2A: The New Face of Leasing*, 3 DEPAUL BUS. & COMM. L.J. 559, 565 (2005).  In other words, is the transaction structured in such a way that the lessor has an objectively reasonable economic expectation that the goods will come back to it at the end of the lease term?  *Id*.

Revised §1-201(37) seeks to guide that economic evaluation.  A lease purported to

---

[31]   The Third Circuit also referenced the Official Comment to the amended version of the statute which states in part:

> Reference to the intent of the parties to create a lease or security agreement [under the former statute] has led to unfortunate results.  In discovering intent, courts have relied upon factors that were thought to be more consistent with sales or loans than leases.  Most of these criteria, however, are as applicable to true leases as to security interests . . . Accordingly, amended section 1-201(37) deletes all references to the parties' intent.

*Pillowtex*, 349 F.3d at 721-22.  *See also, In re Owen*, 221 B.R. 56, 62 (Bankr. N.D.N.Y. 1998)[finding that "...the labeling of the Agreement as a "lease" and referring to the parties as "lessor" and "lessee" in and of themselves are not controlling."]; *In re Homeplace Stores, Inc.*, 228 B.R. 88, 93 (Bankr. D. Del. 1998)[noting that "...[w]hether a document is a security agreement as opposed to a lease...is dependent on certain factors extrinsic to the document and not capable of control by words in the document"].

be a disguised security interest is first analyzed under §1-201(37)(a), which establishes a

two-part *per se* rule, also known as the bright-line test, under which a purported lease

shall be recharacterized as a transaction creating a security interest if the lessee cannot

terminate the payment obligation during the term of the lease and if one of four residual

value factors is found to exist which establishes that the purported lessor has not retained

any meaningful residual interest in the leased goods.[32]  For transactions that satisfy the

foregoing bright-line test, the inquiry comes to an end — such purported leases constitute

security agreements as a matter of law.  *Pillowtex*, 349 F.3d at 717;  *In re Owen*, 221 B.R.

56, 60 (Bankr. N.D.N.Y. 1998) [finding that "[w]hile NYUCC § 1-201(37) clearly

indicates that the Court is to examine the facts of each case in characterizing a

transaction,  . . .  the first paragraph of the amended statute qualifies this by setting out a

bright line test whereby, as a matter of law, a transaction creates a security interest"]; *In re*

---

[32]  The four residual value factors guiding this objective determination are:

> (i) the original term of the lease is equal to or greater than the remaining economic life of the goods,

> (ii) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods,

> (iii) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement, **or**

> (iv) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

N.Y. U.C.C. §1-201(37)(a) (McKinney 2001)(emphasis added).

*Kim*, 232 B.R. 324, 330 (Bankr. E.D. Pa. 1999).

In this particular dispute, the parties agree that the referenced documents do not permit Ecco to terminate its payment obligations under the lease prior to the expiration of the lease term.[33]  Thus, the first prong of the bright-line test is satisfied.  There is also no dispute that the remaining economic life of the rigs (20 to 30 years) extends much further than the four-year lease term provided in the agreements.  The parties further agree that Ecco is not bound under the agreements to renew the lease or to exercise any purchase option.  In fact, Ecco possesses no option to renew the lease agreement at all.  Thus, the only circumstance available to trigger a *per se* finding of a security interest under §1-201(37)(a) is whether the consideration to be paid under the purchase option granted to Ecco under the agreements was a nominal amount.

But what is "nominal" consideration?  Zwirn contends that an option price measured in terms of millions of dollars could never be characterized as nominal.  However, it is widely recognized that the term "is used in its relative, rather than absolute sense" and that "courts have had to devise tests to determine whether consideration of a significant amount can be relatively nominal under the circumstances and thus evidence of a disguised security interest." *Worldcom,* 339 B.R. at 66, n.6.  "Consideration may be sizeable yet still be nominal."  *In re APB Online*, 259 B.R. 812, 818 (Bankr. S.D.N.Y. 2001).  However, the earlier jurisprudence outlined in *Triplex Marine* reveals the

---

[33]    ¶ 2.1 of Ecco Ex. 7 and 8.  See also, Ecco Ex. 30 at p. 4 wherein Zwirn recognizes that the "contracts have hell-or-highwater provisions."

evolution in judicial determinations of whether consideration is nominal in the relative

sense and, though additional help was anticipated, the revisions to §1-201(37) offer little

additional guidance to courts seeking to assess whether the designated consideration in a

particular circumstance should be considered nominal enough to have precluded the

retention of a meaningful residual interest by the purported lessor.[34]  Instead, revised §1-

201(37) offers merely the parameters of the spectrum of nominality.[35]  On one end,

consideration is nominal if it is for less than the lessee's reasonably predictable cost of

performing if the option is not exercised.[36]  On the other end, consideration is *not* nominal

if the purchase option price is based on the fair market value of the property.[37]  However,

parties rarely litigate those extremes and the statute offers little assistance for evaluating

the nominality issue under more median circumstances.  Thus, courts must necessarily

revert to earlier common law tests in evaluating whether an option is nominal under the

---

[34]  "The central feature of a true lease is the reservation of an economically meaningful interest to the lessor at the end of the lease term.  Ordinarily this means two things: (1) at the outset of the lease the parties expect the goods to retain some significant residual value at the end of the lease term; and (2) the lessor retains some entrepreneurial stake (either the possibility of gain or the risk of loss) in the value of the goods at the end of the lease term."  Edward E. Huddleson, *Old Wine in New Bottles: UCC Article 2A-Leases*, 39 ALA. L. REV. 615, 625 (1988).

[35]  E. Carolyn Hochstadter Dicker and John P. Campo, *FF&E and the True Lease Question: Article 2A and Accompanying Amendments to UCC Section 1-201(37)*, 7 AM. BANKR. INST. L. REV. 517, 539 (1999) [hereinafter Dicker and Campo].

[36]  The revised statute does seek to prevent improper consideration of certain isolated attributes usually present in a finance lease that formerly might have been considered persuasive, if not definitive, evidence of a secured transaction.  See N.Y. U.C.C. §1-201(37)(c)(i) (McKinney 2001)(emphasis added).

[37]  *Id.*

economic realities presented by each particular case.[38]

As outlined in *Triplex Marine*, courts have utilized various comparisons in attempting to discern the relative nominality of a purchase option amount. Comparisons of the option price are made to the original purchase price,[39] to the total lease payments,[40] and, ultimately, courts simply try to make sense out of the economic circumstances. "No matter how the option amount is expressed, if the only sensible course of action is to exercise the option, then it is one intended for security." Richard L. Barnes, *Distinguishing Sales and Leases: A Primer on the Scope and Purpose of UCC Article 2A*, 25 U. MEM . L. REV. 873, 885 (1995) and cases cited therein [summarizing that "the option price is nominal if the sensible lessee would in effect have no choice and, in

---

[38] If a court determines that the consideration of this exception does not compel a conclusion that a security interest was created *per se*, it proceeds to an examination of all of the facts to determine whether the economic realities of a particular transaction create a security interest. *In re Taylor*, 209 B.R. 482, 484-85 (Bankr. S.D. Ill. 1997). Since nominality of the purchase option is a major factor in that determination as well, it is really a distinction without a difference as to whether this decision is reached as a result of the bright-line test or a consideration of other economic realities.

[39] *In re Bevis Co., Inc.*, 201 B.R. 923, 926 (Bankr. S.D. Ohio 1996)[finding option price of 10% of cost of equipment to be nominal]; *In re Phoenix Pipe & Tube*, 154 B.R. 197, 200 (Bankr. E.D. Pa. 1993)[same]; *see also In re Super Feeders, Inc.*, 236 B.R. 267, 270 (Bankr. D. Neb. 1999)[finding a fixed option price of 5% of the original purchase price to be nominal while recognizing that a purchase option price of less than 25% of the original purchase price constitutes evidence of a security interest, *citing Kimco Leasing, Inc. v. State Board of Tax Commissioners*, 656 N.E. 2d 1208, 1215 (Ind. Tax. 1995)] and Dicker and Campo, 7 AM. BANKR. INST. L. REV. at 543, notes 90 and cases cited therein ["...option prices of less than 25% of the original cost have been found to be nominal."]

[40] "When the option price is a relatively low percentage of the total lease payments, this indicates nominal consideration." *In re Super Feeders, Inc.*, 236 at 270; *see also, Orix Credit Alliance, Inc. v. Pappas*, 946 F.2d 1258, 1261 (7th Cir. 1991) (finding an option price of 12% of total rental payments to be significant in determining an agreement was a sale rather than a lease); and *In re Wakefield*, 217 B.R. 967, 971 (Bankr. M.D. Ga. 1998) (finding 10% option price "to be significant in concluding that the option price is nominal").

-14-

making the only sensible choice, would cut off the lessor's reversionary interest."].

In tacit recognition of the fact that a 15% option price could likely be deemed nominal in a relative sense under these circumstances if measured by the fair market value of the goods, or by the total purchase price, or by the total lease payments, much of the debate at the hearing centered upon the going concern value of Ecco. Both sides actually exerted great efforts to quantify the actual option price by the use of experts who, based upon recently prepared EBITDA projections, opined about what projections could have been made in 2006 regarding the going concern value of Ecco and whether that amount would have exceeded 15% of the fair market value of the equipment. However, those recently-developed insights are not really germane to this determination.

Execution of a document in this type of dispute creates either a lease or a security interest. "Nominality, therefore, must be determined by considering the parties' *prediction* of concluding value at signing, not by considering the actual value at the conclusion of the term." 4 JAMES J. WHITE AND ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE §30-3 at p. 32 (5th ed. 2002). "Transactions are not true leases where the parties anticipate, *at the outset of the transaction*, that the option will be irresistible in the sense that the option price is extremely low in comparison to the fair market value of the property." Edwin E. Huddleson, *Old Wine in New Bottles: UCC Article 2A-Leases*, 39 Ala. L. Rev. 615, 633 (1988)(emphasis added). Thus, it is the value anticipated by the parties at the time the agreements were executed that determines

whether the option price is nominal.

Ecco's representative, Bill Roberts, testified that he thought that the value of the equipment at the end of the contract term would be approximately the acquisition cost (less interest) – $42.5 million – and he estimated at that time that Ecco's EBITDA could be approximately $22 million. Though he believed that the eventual purchase option would be based upon 15% of the fair market value of the equipment (thereby resulting in an anticipated $6.375 million option price), there was never any doubt in his mind that the purchase option would be exercised and that, if the transaction resulted in Ecco's acquisition of six operating drilling rigs, the option price would be "a bargain" no matter which formula was used or what set of projected numbers was applied. In his words, "we would have never paid the principal and the interest and then walked away."

Conversely, the evidence establishes that Zwirn expected the purchase option to be exercised as well. It did no independent valuation regarding the anticipated fair market value of the equipment or the projected going concern value of Ecco at the end of the contract term. To the extent it was concerned at all about those issues, it simply relied upon Ecco's projections.[41] The evidence establishes that Zwirn's focus instead was upon evaluating its exposure during the contract term and maximizing its anticipated return at the conclusion of the contract term. Zwirn operatives consistently evaluated this

---

[41] Ecco Ex. 30 at p. 6.

transaction in these terms.[42]  Those attenuated from the negotiations were surprised to

learn that the stream of lease payments would fully amortize the debt at 14% and

expressed disbelief that Ecco had agreed to pay a 15% purchase option in addition to the

fully amortized debt.[43]  The purchase option was essentially viewed by Zwirn as a

premium,[44] which at one point was expected to raise its return on investment to the range

of 19%.[45]  The evidence reflects that Zwirn was constantly evaluating its "exit point" and

those evaluations never contemplated or evaluated the reacquisition of the equipment as a

component.

And that focus never changed.  Its December 2006 internal memorandum, which

summarized the restructuring transactions which had occurred in the prior month, stated

that "we *received* effectively 60% of the equity in [Ecco], split between a 45% warrant

position and a 15% residual, based on the greater of the going concern value of the

Company or cost of the equipment."[46]  That report concluded as follows:

---

[42]  It is also true that everyone in the transaction treated this as a capital lease for accounting purposes.  It was treated in the financial statements of both Ecco and Zwirn as a loan.  It was treated as a loan for tax purposes by both entities.  Indeed, Zwirn's accountants characterized them as disguised loans, notwithstanding their structure as leases, and insisted upon written confirmation that the lessee was  treating the transactions like loans, just like Zwirn.  Ecco Ex. 18.  While accounting and tax treatments do not necessarily dictate legal characterizations, the evidence establishes that these treatments are imposed in recognition of the economic realities of the transaction.

[43]  Ecco Ex. 17.

[44]  Ecco Ex. 18.

[45]  This was Gasparini's projection in the spring, Ecco Ex. 17, and was still Zwirn's expectation in December 2006.    Ecco Ex. 30.

[46]  Ecco Ex. 30 at p. 2 (emphasis added).

*Expected Returns*

Based on expected total fundings of $42.1 million, progress payments of 0.01235 for the first two months and then 48 monthly lease payments thereafter, and factoring in the 15% purchase option (ascribing no value to the warrants) based on cost, our expected return is 37%. If we factor in the value of our warrants (45% of the Company), at the end of the 48-month term, using cost as a conservative estimate of enterprise value, our expected return is 52.8%.[47]

No projection or contingency is ever made regarding the return of the equipment. No mention is ever made of any expectant value of returned equipment at the end of the contract term. Though Zwirn's representative, Todd Dittman, testified at the hearing that he "had no idea" at the time as to whether Ecco would exercise the purchase option and sought to highlight reasons which might have precluded the actual exercise of the purchase option by Ecco,[48] he had honestly conceded at a deposition three weeks earlier that, "It looked to us as if it could have been a very attractive economic option for them."[49] Despite its contemporary pleas to the contrary, Zwirn's actions at the time of the transaction fail to reveal any effort to plan, provide or protect any entrepreneurial stake or other residual interest which it supposedly held in the goods.

---

[47] Ecco Ex. 30.

[48] Again considerations raised in 2008 really are not germane, nor are the actual events in the way they unfolded. There is no evidence that these considerations were raised and evaluated at the time of the transaction. "Foresight not hindsight controls." 4 JAMES J. WHITE AND ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE §30-3 at p. 29 (5th ed. 2002).

[49] Ecco Ex. 37.

Zwirn made no attempt to ascertain what the residual value of the equipment would be at the end of the lease term because it understood that the circumstances of the transaction dictated that Ecco would exercise the purchase option no matter how the final figure was quantified.  A fair appraisal of the circumstances reveals that the most compelling economic reality existing at the time of the transaction was that the agreement encompassed the primary assets that allowed Ecco to conduct its business enterprise.  In agreeing to the parameters of the purchase option, Ecco was not planning on its own demise, nor was Zwirn expecting it.  If Ecco did not exercise the purchase option at the end of the term, it would be left without those rigs and without any guarantee that those rigs could be replaced in any reasonable or timely manner.  The transaction was not structured in anticipation that Ecco would simply walk away from these rigs four years into a 30-year useful life after having gone to considerable efforts to plan and direct the construction of those rigs, after having crafted them and implemented them for their specific drilling needs, and after having paid $56 million for Zwirn's funding of the $42.5 million construction price.[50]  Certainly the payment of a 15% purchase option, whether calculated upon the basis of the rigs' fair market value or upon the possibility of a debtor's enhanced EBITDA, would have not inhibited Ecco's retention of the rigs,

---

[50]  The fact that Ecco was required to pay an amount greater than the entire purchase price of the assets further buttresses the conclusion that these agreements created a security interest rather than a lease.  Courts applying New York law have noted that "if the alleged lessee is obligated to pay the lessor a sum equal to or greater than the full purchase price of the leased goods plus an interest charge over the term of the alleged lease agreement, a sale is likely to have been intended since what the lessor will receive is more than a payment for the use of the leased goods and loss of their value; the lessor will receive a consideration that would amount to a return on its investment." *Owen*, 221 B.R. at 61-62.

regardless of how high the calculated number became.  Indeed, by including the EBITDA

alternate calculation, the agreements reflected the economic reality that the transfer of six

fully operational drilling rigs for only 15% of the rigs' market value would likely occur

and that such a transfer would place Ecco into an economically advantageous position in

the marketplace — a position likely to bring financial vitality to its balance sheet — and it

was an anticipated vitality in which Zwirn was eager to participate.  The concept that

Ecco, after having invested so much into the procurement and adaptation of these rigs,

would simply forego all of that investment of time and energy and start its operations

from scratch to acquire similar but unfamiliar assets from another source, instead of

exercising a 15% option (and thereby giving Zwirn a *meaningful* residual interest under

the realities of the situation), is simply not credible.  Conversely, Mr. Roberts' testimony

that Ecco always intended to exercise the purchase option under these agreements is both

credible and compelling.

   White and Summers suggest that the issue of nominality under §1-201(37) "is

merely a proxy for the questions: Is the option price so low that the lessee will certainly

exercise it and will, in all probable circumstances, leave no meaningful reversion for the

lessor?"[51]  Under the circumstances presented in this case, the Court finds that the answer

lies in the affirmative.[52]

_____

[51]  4 WHITE AND SUMMERS, *supra* note 48, at p. 33.

[52]  This conclusion does nothing to preclude the recognition of legitimate finance leases.  It
recognizes, however, that, when such a finance lease involves the primary operating assets of a company,
the lessee's right to terminate the leasing relationship during the contract term becomes of heightened

## Conclusion

This Court therefore concludes that the two agreements between Ecco and Zwirn's subsidiary, Bernard National Loan Investors, Ltd., identified as the "Amended and Restated Master Lease Agreement" [Ecco Ex. 8] and the "Master Lease Agreement" [Ecco Ex. 7], must each be characterized under the provisions of §1-201(37)(a) of the New York Uniform Commercial Code as documents creating security interests in favor of Bernard National Loan Investors, Ltd. in the assets of Ecco Drilling Co., Ltd.  This conclusion is mandated under the *per se* rule of §1-201(37)(a)(iv), as well as under a general examination of all of the facts and circumstances in this case.  Therefore, the Motion to Determine Characterization of Leases filed by Ecco Drilling Company, Ltd. shall be granted.

This memorandum of decision constitutes the Court's findings of fact and conclusions of law[53] pursuant to Fed. R. Civ. P. 52, as incorporated into contested matters in bankruptcy cases by Fed. R. Bankr. P. 7052 and 9014.  A separate order will be entered which is consistent with this opinion.

Signed on 06/17/2008

THE HONORABLE BILL PARKER
CHIEF UNITED STATES BANKRUPTCY JUDGE

importance, there should be a rational relationship between the contract term and the amount paid by the lessee, and any option to purchase the assets must be substantial enough to clearly demonstrate that the lessor expects to enjoy a reversionary interest at the end of the contract term.

[53]  To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such.  To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such.  The Court reserves the right to make additional findings and conclusions as may be necessary.